McGee v. Larry Parsano I see Mr. Kernick, I see Mr. Onrath, and I see Mr. Gordon. Can you all hear me? Yes. Yes, we can, Your Honor. Good. Then let's proceed. Mr. Kernick, I think you're up first. I am. Thank you. Good morning, Your Honors. May it please the court. Where the underlying facts, what an officer saw, what an officer was told, what an officer heard, where those underlying facts are undisputed, the ultimate fact, what that officer knew or what was obvious to that officer is a question of law for the court. That is our position in connection with the claim of the plaintiff that this court lacks jurisdiction. That is our position in connection with our position that the judge wrongfully denied summary judgment. The reason we say that it's a question of law for the court, as we cited to the court in our brief, in Bell v. Irwin, this court held that the reasonableness of an officer's action in connection with the use of force or the reasonableness of an officer's belief in connection with the existence of probable cause, where those facts are undisputed, that question is a question of law for the court. So, and significantly, what the court said in that case is judges rather than juries determine what limits the Constitution places on official misconduct. So a jury doesn't decide what the Constitution requires. It's up to the judge to decide what the Constitution requires, where the facts are disputed. And while this may be a 14th Amendment claim, the standard is generally objective reasonableness or reasonableness standard. So we think that the case law holding that where the facts are is a question of law for the court, that that same proposition applies in this particular case. So because knowledge is a question of law for the court, the facts are undisputed and this court has jurisdiction. Now, as far as the facts being undisputed, I would like to address one aspect of those facts in particular. The plaintiff in his response brief and the court below as well, failed to recognize that what occurred outside the medical cell in the medical unit. In the medical cell is where the events first took place. That's where, according to the plaintiff, Nurse Bates made a half-hearted attempt to try and do a pulse ox. I assume the court is familiar with what a pulse ox is, a little clip you put on your finger and it glows red and it reads up blood pressure, it reads pulse and oxygen level. Well, accepting the proposition that she may have made a half-hearted attempt or could not take a pulse ox there, it is undisputed and the plaintiff has admitted that when Carter was dragged out of the cell into the medical unit, right out of the cell, the nurse was bent over tending to Carter and that had occurred for approximately five minutes while the other officers stood around and watched what nurse was doing. Now, the plaintiff claims that a factual dispute may exist because some officers described Carter as being lethargic, some officers described him as appearing intoxicated. We will accept those characterizations, but keep in mind that the officer's observations are the same thing that the nurse saw. So, if the nurse, if the officers feel that the nurse is not alarmed or that the nurse is appropriately tending to this individual, you know, however they characterize what they observe, it does not raise a disputed fact. And I would simply point, as I'll discuss later, comparing lethargic, comparing appearing intoxicated, consider what the officers observed in the Seventh Circuit decision of King v. Kramer. They saw a prisoner laying on the floor in seizures, convulsing, and foaming at his mouth. And a nurse showed up, accused him of faking, did smelling salts, like was done in this case, which is undisputed. But yet, the officers, because they did not receive any training in what seizures were and what causes seizures and how serious it was, because they lacked training there, it was not obvious to them that what the nurse was doing or not doing was inadequate. Mr. Curtick, where do we draw the line between, where do we draw the line between when it's clear that a medical professional's treatment is so inadequate that a correctional officer has to do something that might conflict with her advice or direction? What's the line? I think we draw the line at the, I'll call it, obviousness to a layperson. Because that's what when I use the term layperson, I use the term a person not medically trained or a person not having some peculiar knowledge. For example, a person, if a person is a diabetic, they may have some peculiar knowledge on what, you know, on symptoms of adverse sugar level. But I'm talking about a reasonable person. And we draw the line on obviousness. For example, a person is bleeding out and a nurse does nothing. Their layperson would recognize something is required. A person has a compound fracture with a bone sticking out. A layperson would know you better do something about it and splint and splint. That's where I would draw the line on what a reasonably untrained person should know or in fact does know. And it's based upon the obviousness of the condition that they're observing. Would the layperson look at this and call an ambulance? Would the layperson take the person to a hospital? We submit that only in the most egregious cases, only in cases of the ilk that I just mentioned, those two examples. And the reason I say that is if you look at the cases that this court has decided, if you look at King versus Kramer, where an individual was writhing on the floor, if you look at Hayes, where a person is complaining of pain and there's obvious symptoms or urological conditions, that would be obvious to the officers that this pain is not feigned. If you look at those types of situations, you look at Miranda versus County of Lake. There, a woman went from 140 pounds to down to 120 pounds because she was not eating or drinking fluids in the 10 days that she was in jail. Even under those situations, which I would say border on egregious, they at least set a line, if you will. And you look at those types of situations that have confronted the officers, I would say that it's got to be more egregious than that. It's got to be something where all I can say is, you know, maybe we look at the court's definition of pornography. I know it when I see it. Maybe that's the best guideline that Your Honor can have here. I know when a lay person would recognize that something more is required. And that's what's the touchstone here is, was the nurse, should the nurse, and was it obvious to the nurse, did we know that what the nurse was doing was not sufficient? It's undisputed that she took a pulse ox. It's undisputed that she was bent over tending to him for five minutes before they left. It's undisputed that she said, he's fine. It's undisputed that she said his symptoms or his blood, his readings are better than mine. And it's also undisputed that when Carter was taken to the general population, to the solitary cell, she continued to provide treatment. She gave him a shot of insulin after consulting with the doctor. And she told Collins, I'm going to be talking to the doctor and see what I should be doing. She came back and gave him a shot. She did not have a problem or indicate that Carter should be taken back to medical. So it was not obvious to the officers that what she was doing and what she was omitting was not placing this individual's life in jeopardy. So, you know, and plaintiff's counsel talks about, well, officer Waller, who was in the trod when Carter was taken there, thought he was sick. Well, what officer Waller believed is unimportant in this case. He didn't know any of the background. He didn't know what the nurse said. He didn't know that she took a pulse ox. He didn't know that his vitals were fine. So what Waller may have said or may have thought is unimportant in this case. And your honors, we can go to, you know, I talked about King versus Kramer. Mr. Koenig, your time has expired. I've spoken with Mr. Unruh. He says he can do his in three minutes. So if I could have another two minutes. We've gone into our rebuttal time here. Yes, you've used all your time. Then I yield to plaintiff's counsel. Sorry about that, your honor. All right. Well, Mr. Unruh, if you have something to add, Mr. Koenig used all of his time, but you have five minutes remaining. I'll keep my briefs very brief so that we'll have sufficient time for rebuttal. I just want to point out in terms of where to draw the line, and I think that this is a very important question, what we know is that gross negligence is not enough. And I think that that's very important here. We also have to look at the law, that the reasonableness of their conduct is judged against the backdrop of the law in place at the time of the conduct. Now, in the Casella decision, the court, and this is a quote, said existing precedent must have placed the statutory or constitutional question beyond debate. Now, that's very strong language here. Specificity is the key. A clearly established constitutional right cannot be defined in general terms. Now, here we have law stating that correctional officers can and should defer to medical professionals without fear of liability for doing so. Given that law, how can we say, how is it possible that we can have a clearly established constitutional right that these correctional officers should have known about? That concludes my remarks, and we'll reserve the remaining for rebuttal. Thank you. That's fine. Thank you. Mr. Gordon. Mr. Gordon, you're still on mute. If it may please the court. Plaintiff accepts counsel's characterization that you draw the line at obviousness. The reason a plaintiff has argued that the appellate court does not have jurisdiction is precisely based upon counsel's factual arguments. Counsel has suggested that these issues are undisputed. That is false. The plaintiff has alleged, and the evidence is strong, and the district court found that there was no evidence that vitals were taken of Mr. Carter when he was in the cell, when he was in the hospital unit, or even when he was inside of solitary confinement. There was also no evidence that the nurse ever took his blood pressure, and the officers have testified that they didn't witness her take his blood pressure, that she was unable to take his blood pressure reading while he was inside of the solitary confinement cell. If we accept or count... Mr. Gordon, is there any evidence in the record that these officers had any kind of medical training other than basic first aid and CPR? No other evidence of any additional medical training, but there was awareness that a, one, that Mr. Carter was diabetic. Two... But Officer West didn't know that, correct? Well, to the extent that the standard is one of objective reasonableness, he should have known. Based upon him being in the cell, the testimony was that someone, that a detainee who had a food carton that has a D on it, that that's a signifier of that detainee being a diabetic, them receiving a diabetic meal. In addition to that knowledge, the officers had awareness based upon the testimony of Officer Waller, Brandon Waller, that any of the officers would have known that a reading of 500 or greater was a serious medical condition or an issue. But that's different than knowing that he's a diabetic. Well, no, that is a, right, that is a different issue. I was adding on to the fact that they all, that they all would have known based upon their proximity to Mr. Carter while he was in his cell and to the food tray, the food carton. And is there any evidence that Nurse Bates had failed to properly treat patients in the past? There is evidence, but there is no evidence that any of the defendant officers maybe had that awareness. There is evidence in the record that there were multiple complaints from family members of detainees who had called to the jail prior to that, who had concerns about the treatment that was received by their loved ones from Nurse Bates. And Mr. Gordon, where do you think the line should be drawn between a medical judgment by a medical professional and when a correctional officer should step in and disregard that judgment? I accept the standard that is laid out by opposing counsel when it would be obvious to a lay person. And if we look at the record, it was obvious to many of the officers involved in this case, both named as defendants and witnesses. They said it out of their own mouth. Officer Page, who was a defendant in this case, said it was obvious to him that he was sick. It was obvious to him that he should have stayed in the medical unit instead of being dragged and dumped into solitary confinement out of view of a video camera. He was 100% sure he was sick. This is his own words. He testified that he felt that Mr. Carter should have been transported to the as they brought Mr. Carter to the solitary confinement cell and asked why he was being brought there because he obviously was sick and he obviously needed medical attention. I would like to interject a minute as far as what Waller did. At what point did he encounter? He encountered, sure Judge, he encountered him approximately maybe 15 minutes after the Carter. They encountered him in the cell, dealt with him while he was actually inside the medical cell, dragged him out into the medical unit. That timeframe was about 15 minutes. Then they dragged him to this area of the jail called Deadlock. This is where Officer Waller was assigned. So as soon as he got to this particular tier, that's when Officer Waller, he encountered him and three of the officers helped with the transport. It was Wes, Paige and Collins. What did Waller do? Did he have some authority to intervene or was he just an observer that happened to be passing by? Well, he was assigned, he was the correctional officer who was assigned to the Deadlock tier. So from my understanding, based upon the testimony, he gave the transporting officers access to the cell. But prior to them putting Mr. Carter into the cell, he testified that he asked him, why are you bringing this guy here? He's obviously sick, he's pale, he's sickly, he doesn't belong here, he belongs in medical. But he was of a lower rank than Sergeant Wes. And so when Officer Waller testified, I asked him in deposition, well, what happened after you expressed your concern and asked why is he being brought here? He said they didn't say anything and they just left. So that was his interaction. He said that he was outranked by Sergeant Wes, but that he had expressed that concern. All right, that's all I want to know. He didn't have the authority to override them then? Correct, Judge, correct. Mr. Gordon, how do you distinguish this case from King? In King, there was an inmate who was convulsing, foaming at the mouth, had turned blue, didn't react to smelling salts. And the nurse said that he was just faking it. And the officers didn't do anything. And we found that the officers were aware that King did not present any evidence that the officers were aware that that King was being improperly treated. That is the distinction between this case. The officers, a couple things. The officers, one of the officers told, or made a suggestion, Officer Collins made a suggestion to that she might want to check his glucose level based upon the D on the carton. And in response to Collins making this suggestion, she said, well, I guess I will if you want me to. And this is after the obvious awareness that he was very sick and they placed him into a solitary confinement cell out of camera view. So that's number one. Secondly, after he registers at 500 and there's awareness based upon Officer Wallace's testimony that all the officers would have known that that was a serious medical condition, in addition to the obviousness of his condition, they left him in a cell. And this is something that still makes no sense. And I don't think I don't think the opposition can really explain this fact that why they would leave this man inside of an isolated cell. The testimony during the case was, well, they thought he was faking and being noncompliant. So they took him to this particular housing unit for noncompliant detainees or or inmates who have refused housing assignment. But once it's obvious, once it's objectively obvious, this is the standard that counsel has laid out to a lay person. These are lay people who out of their own mouth have said it was 100 percent sure he was sick. No, we needed to go to the hospital. Why would you leave this man inside of a solitary confined cell? This did not happen in King. The officers did not intervene and put him in a condition in King. The officers didn't have any reason, any indicators to to believe that he was being improperly treated. There was there was no adjustment by nurse base to to to even say, listen, I understand maybe I had a different perspective while he was in the medical unit. But listen, I'm you know, now I've changed my mind. Let's get him out of this solitary confinement cell at a certain point for the protection of pretrial detainees who have rights. Right. Something has to kick in there. You know, something has to kick in when it's obvious that somebody has a serious medical condition, when it's obvious that something is not right with the medical treatment. So to so so to be on autopilot with this course of action to dump him into this cell and not to take a moment and to interpret the obviousness of the situation and reevaluate either to one, bring him back to medical or to tell tell someone higher up the commanding officer of the jail who Corporal Austin, excuse me, I say it's Sergeant West before it's it's it's Corporal West. Corporal Austin was the officer who was in charge or the commanding officer who was in charge of the jail. They could have notified her or they could have just called a an ambulance to save this man's life. They had that option. That was one of the policies of the jail. That was that was testified to by Sergeant Atkins, that the officers could have called an ambulance on their own if they felt that the treatment wasn't up to par or it was lacking. But instead, they waited several hours until Officer Collins finally said something to Corporal Austin. By this time, as soon as Corporal Austin saw him, she jumped into action. This is the commanding officer of the jail on this particular day. And so these options were on the table for these officers. They knew that the nurse was not doing her job. She was not in some, you know, frequent monitoring of this detainee who was obviously sick. She couldn't be because there was no video surveillance. You know, this is not somebody who had a cold. These these officers beyond what we're able to see on the video, which the court had the benefit of as well, in addition to the testimony out of several of the officers own mouths, they said they were positive he was sick. Page said I was 100 percent sure he should have went to the hospital, not just even been tended to more. He should have went to the hospital. And so this man died. Right. So these these facts were not present in King. They they witnessed a certain manifestation of symptoms. And the the the medical provider said he'll be fine. But they didn't do anything to put him in a worse condition. And the medical provider was still present during the during the episodes that King experienced. So that case is is distinguishable. And yeah, so so plaintiff plaintiff accepts that standard as it relates to the the obviousness. And it was clear on that day that a pretrial detainee is entitled is entitled to adequate medical care. That is obvious. And the court found that and the failure to the failure to to act. In light of a serious need was unconstitutional, and for that reason, the the defendants appeal should should be denied. Thank you. Thank you very much. All right. Mr. Kernick, I understand you'll be using Mr. Unreth's rebuttal time, so you may proceed. But you're still on mute. You'll have to unmute your microphone. I wanted to shut off my clock. None of the officers received any training beyond basic beyond basic first aid and CPR. None of the officers were diabetic. None of the officers recognized the significance or significance of a reading on the of a blood sugar reading of 500. That is all the undisputed evidence. What Corporal Austin knew, Corporal Austin entered the picture at about 1115 or so. Corporal Austin herself was a type one diabetic. Corporal Austin herself, the evidence shows, did in fact experience ketoacidosis at one time. So she had peculiar knowledge, more knowledge than any of the defendants had in this particular case. There is no evidence that that any officer said he should be transported to the hospital, at least not until approximately 1115 or 1120 after all of the other officers have bowed out of the picture when Corporal Austin first saw the plaintiff, the deceased. The deceased was not placed in incommunicado. This was not some cell walled off from the rest of the population. This was a cell in a trod along with other cells, which viewed into the day area, which had a button where he could communicate to the to the trod officer and where he was observed every half hour as is required by the general regulations. There is no evidence that they failed to properly treat inmates in the past, nor is there any evidence that the officer, in fact, the officers affirmatively stated as far as they're aware, she never mistreated or failed to properly administer medical care to any of the prisoners. King, your honor, if you look at King, this case, King screams that the judge should be reversed in this case. After the nurse came in and saw this inmate foaming at the mouth in seizures, she accused him of faking. In fact, one of the correctional officers said, quote, come on, you big baby, get up, close quote. That's what the officers thought in that case. She walked away. They were not held liable as a result of that. Then she came back an hour and a half later and found the same thing experiencing seizures. The officers still were held as a matter of law, your honor, not to have acted unconstitutionally. That's the first prong of the qualified immunity argument. They were found not to have acted unconstitutionally. The second prong in this case, it is the plaintiff's burden to come forward with some case to put the defendants on notice that their actions in this case were unconstitutional. What he did has been frequently condemned by the court to argue based upon a generality. Well, they're entitled to medical care. You have to put meat on the bones of that argument. You have to say more than that they're entitled to medical care. You have to show that under the constitutional relevant facts in this case, these officers knew that nurse Bates was not failing to properly, was failing to properly treat the individuals. We have two reasons for this case to be reversed. One, based upon King and the other cases we've cited, the officers did not act unconstitutionally and it was not obvious to them that the nurse was in the parlance screwing up. And secondly, the plaintiff has failed to carry his burden to bring a case to the attention of this court to show that what the officers were doing and they were put on notice, they were acting unconstitutional. How long was he in the, uh, whatever they call the holding cell or deadlock? I'm sorry, your honor. How long was he in what I think they refer to as the deadlock? He was, he was taken from the medical unit. As I recall at approximately 925, he was gone. He then was taken directly to trod five where the quote deadlock cell was located. Tried five is a big housing unit. He was taken immediately there. So he would have gotten there around five minutes later, nine 30, uh, nine 35. And then it was about 10 15 that he received insulin shot from nurse Bates. All right. Does that answer your honor's question? Oh, that's a matter of how long he was there before somebody realized he's dying or dead. Okay. It was about, it was about 1120 when corporal Austin entered the picture, went into the cell a second time with nurse Bates. And that's when she recognized that she felt this 1130. So that would have been approximately just under two hours after he was in that cell. Is that where they put him in a squad car? That's when they were ready. That's when they were ready to put him in the squad car. And that's when nurse Bates, uh, called Dr. Breakout and asked what should we do? And that's when he said, I'm not allegedly, I'm not paying a thousand dollars for an ambulance, put him in a squad car. We were ready to put them in the squad car. We came, um, at about 1135 with a wheelchair and found him unresponsive. When I say we, that was one of the correctional officers, officer, uh, page. Okay. All right. Thank you very much. Our thanks to all counsel. The case is taken under revise.